Whenever you're ready, counsel. Thank you, Your Honor. And may it please the court, once again, my name is Larry Wolkin. I represent Lisa Yearick, but I will be arguing on behalf of both appellants. The Constitution tolerates the use of deadly force by police officers when necessary to thwart an imminent threat to life. The district court correctly found that the video of the shooting largely supports the plaintiff's contentions. In its words, quote, Mr. Rudman's arms appear to stay at his side as he walked towards the officers with the gun, and there was absolutely no indication that he was swinging the gun erratically above his head or at a 90-degree angle, as the officers stated. While we credit the district court with properly framing the This circuit framed the legal norm controlling this case back in 2013 in George v. Morris, a case cited over 300 times in the circuit and specifically 75 times by this court. There, just like here, the deputies shot and killed a suicidal man. Counsel, it's undisputed here that the there had been six shots, right? That is correct. And it's undisputed that the dispatchers told the officer that he had the gun, which they saw, right? Also correct. And it's undisputed that the dispatcher told the officer that his wife thought he was trying to, quote, kill himself by cop, right? Uh, time before the shooting. But yes, Your Honor. Yes. Uh, so what case, uh, would put the officers on notice that in that kind of a circumstance where the where the plaintiff's decedent, uh, is advancing slowly on the officers in the light most favorable to you with the gun down, uh, disregarding and affirmatively rejecting their commands to stop that they had to wait until he like here, the officers were called as a result of a 911 dispatch because of a call by a wife for a suicidal husband. Same same. Very similar fact there. Just like here, the person had a gun, and they're just like he was approaching the officers. That is the distinction that that both the district court and the appellants draw between George versus Morris. But there's two things that this court recognized in George that we think are on point. First, and this is broadly, the court pointed to four, the circuit court, this court pointed to four of its authorities, Glenn, Long, Scott and Harris, all of which held that just the mere fact that a suspect has a weapon does not in and of itself justify the use of lethal force. But second, and directly to your point, we don't believe that the law requires the officers to wait for a suspect to train its gun on them before using lethal force. But this court held in George that what they must wait for or what they must quote reasonably perceive is a furtive movement, harrowing gesture or serious. Why why isn't the fact that Mr. Redmond was walking toward the officers refusing to comply with their commands, why isn't that that additional fact of walking toward the officers enough to count as a furtive movement under George? Because both that because in Ellens versus Sierra Madre, this court held that we don't require a case to quote-unquote mirror the specific facts. And I would turn this court to its decision in Lopez versus Gallagher. And here's here's why. In that case, there was a young man who was carrying a fake AK-47 in an area that was known to have real AK-47s. And as he was walking, an officer said, stop, drop the gun. And what the teenager did was he turned, and as he turned, he was shot. Now the court held that a jury could find that that was an unreasonable use of force. And you may ask, well why is that case, why does that case put the officers on clear notice that what they did in this case was unconstitutional? And the reason I believe it's instructive is because in Galhas, this court said, and this is a quote, George mirrors the facts here, close quote. But the facts in our case, they are much, much closer to the facts in George than was in the case in Lopez. In George and in our case, there was a 911 call from a wife about a suicidal husband. That wasn't the case in Lopez. In George and in our case, there was a handgun in a low crime area, and that certainly was not true in Lopez, where there was a fake machine gun in a high crime area. In George and in our case, there was no quick movement. Not true in Lopez, where the teenager made the turn and was shot by the officers. George and Lopez, by the way, don't stand alone. In Lopez, the court, this court, pointed to similar... So what were the officers on notice at other than a high level of generality that they had to wait for? A furtive movement, harrowing gesture, or serious verbal threat. That's what this court's holding was in George. And advancing and not stopping, holding what the officers in the light most favorable to you would perceive to be a loaded gun. That's not enough. I don't think it is, given the context of what they knew when they went into the... So what else here could it have been other than the suspect? This was a 357, right? Yes. So other than the suspect, I'm sorry, other than the plaintiff's decedent, moving up his hand with the gun. And by that point, it could all be too late. So if it's something beside moving the hand up with the gun, what exactly is it that the case has put the officers on notice that they had to wait for at other than a high level of generality? Give me an example. Well, I would... So taking out the context in a different light, in other words, they knew in this case that this was a man who was despondent and wanted to commit what's often called suicide by cop. And he'd said that. Correct, which we think militates towards a finding that the officers should have taken pause and waited until either, in this court's words, there was a furtive moment, harrowing gesture... Doesn't suicide by cop often involve somebody shooting in order to draw fire? But it all... Well, it may, but it also may involve a person who's asking for help, who is in a despondent mental state, which I understand this isn't controlling, but this court said in early that that was a factor that the officers should... But again, tell me with some specificity an example of what would have allowed them to shoot, what this furtive movement type of thing that you're talking about is, other than raising the .357. Sure, and when this court, other than what this court calls a furtive movement, if the, in this court's words, if the victim made a going to raise my gun and shoot you, that would be a serious verbal threat that, in the context of what was happening, might theoretically have been a justifiable use of force. So when he says, I'm not stopping here, and in response to a request to stop, says that's not going to happen? He was... And that did happen, Your Honor. And so the question is, in the context of what he was doing, which is he was moving very slowly with the, with the gun trained down to the ground, our evidence that we had used through our experts says, look, officers are trained to respond to situations like this because they happen, unfortunately, more often than we would like to see. And so this, this circuit's precedent says it's got to be more than just, more than just a gun to the ground. There has to be something a little bit more, and especially in this context, when the officers were faced with what they knew was a despondent man who wanted to kill himself but didn't, didn't carry out the, the, the, the suicide on his own, wanted assistance in doing that. That's a unique circumstance in today's day and age when we see this again and again with high rates of mental illness and people who have unfortunate encounters with police officers. They know, they're trained, and I'm not, I'm not trying to say what they know, but they've been trained, and we point to that training, that in these circumstances, time is on their side, that they can take strategic... Unless they're shot and killed, then time wasn't on their side. Well, and I'm not, and, and, and, and certainly I'm not suggesting that, that we, there's, again, as I stated in my argument, I'm not saying that police officers in this case needed to wait for Mr. Rudman to train his, his gun on them. That is not what the law says. The problem I'm having, I suppose, is that I, I share Judge Bennett's question, which is that I, I can't determine sort of what you would have asked the officers to wait for. We have Mr. Rudman continuing to walk, holding a loaded firearm, and saying, I can't do that, when he's asked to stop. So what, what is the, the, the additional thing that they needed to wait for? I would, well, I don't, I don't want to frame it in terms of what they would wait for, but whether they had other options, and, and, and the most obvious one is that they could have done what Deputy Normyle did, was prepare to use non-lethal force. They had the beanbag shotgun first. I don't believe that that's dispositive, but I believe it's a factor that a jury should be entitled to consider. The other thing, Judge Thomas, that might be appropriate would be for them to talk to Mr. Rudman instead of giving commands, because these officers are trained that when you are dealing with someone who is mentally despondent, sometimes speaking to them, slowing down the situation, which was already a slow-moving situation in, with respect to his, his pace towards them, which I think everyone concedes, I think that those are things, Judge Thomas, that the officers could have done, consider, and they were doing. Deputy Normyle said that he was going through, in his mind, the progression, and he was about to yell non-lethal, which is, and, and the evidence in this case is that the reason why they do that is so that there's not a mistake of fire, because once firing starts, then, then typically all of the officers go at the same time. So the, the direct answer to the question is two things. One, allow the, the use of non-lethal force to take place, and two, also to, to, to speak with Edward and see if they could have calmed him down. I have two minutes and 40 seconds left. I'm sorry. So I do want to ask one question that's unrelated to what you've been discussing, and we'll give you some extra time if you need it on, on rebuttal. Thank you. As far as I can tell from my looking at the, and I'm gonna ask your on this question too, but as far as I can tell from my looking at the record before the district court and the briefs on appeal, both sides agree that in determining the wrongful death claims, that we look exactly to the Fourth Amendment standard on the reasonable use of force, and that there is nothing peculiar or different about Arizona law or ARS 13-410. Is that the plaintiff's position? It is, and that's actually where I was going, which is that, and in fairness to my, to my friend, four days before we submitted our brief, this court issued an opinion in Peck versus Montoya, and that specifically addressed the 14th Amendment claim that we have, and in light of that, I don't believe it's fair for me to continue to advance the 14th Amendment claim, and the reason why I think that that links directly into the question that you just asked is because the damages that are recoverable under the 14th Amendment mirror the damages that are recoverable under Arizona's wrongful death statute, and so this court need not reach the constitutional question that the 14th Amendment issue presents because the damages would, would be the same, and I think further to get directly to your point, if this court were to find that there was a question of fact on the first prong on the Fourth Amendment question, whether it's a jury question of whether force was used reasonably, but then find that the law just wasn't clearly established enough, then the case in our view should be remanded for a continuation under just the state wrongful death claim. All right, thank you, and we'll give you two minutes on the floor. Thank you, Your Honor. Thank you, Your Honor, and good morning. My name is Sean Moore. I'm with the Maricopa County Attorney's Office. I represent the appellants in this matter, and with me at council table is Charles Trullinger. I'm gonna start off by addressing the last question that you had, and that is we agree that the state law claim is basically the exact same as the Fourth Amendment claim here, and the analysis should be the same, so there's no unique analysis that needs to be done on that point, and on that I'm gonna jump straight into the Fourth Amendment claim, and I'm gonna go straight to the second factor, whether the suspect, Mr. Rudman, posed a significant level of threat to the safety of the officers or others. It is the facts in this case, so I'm not gonna go back and rehash those things, but what I am going to do is I'm going to talk about, because one thing that my friend here raised repeatedly in his argument is that he wanted some evidence of the furtive gesture, you know, the furtive movement or the harrowing gesture, and I think that he's really too concentrated on the pure syntax of that test. The case law is clear that there does not need to be some herky-jerky motion. The guy does not need to jump out of a bush or something. What that test is really asking is, does the suspect pose a level of threat to the officers or others such that the use of lethal force is justified? And it doesn't have to be something sudden. It doesn't have to be the pointing of the gun as everyone recognizes, and considering all the facts here, I think it is pretty obvious that the actions Mr. Rudman took did present that level of threat that warranted the lethal response. Does it make a difference in this case that it was a gun involved as opposed to a knife? I think it does make some degree of difference, Your Honor. We do have a number of cases where somebody's advancing with what appears to be a knife, and we said, no, you're not entitled to qualified immunity under those circumstances. Right. The gun is obviously lethal at range, and that's something that I want to talk about right now is, sorry, go ahead. No, go ahead. It's pretty well known that handguns, revolvers, are not very accurate at range, much more dangerous up close. So as Mr. Rudman is approaching them down this driveway, the danger presented by himself and his weapon is increasing with every step he takes closer to the deputies. And by over the 24 seconds that he's walking towards them, the danger that him and his weapon represent increases dramatically over that time. And on top of that, consider the time... He was shot at about 60 feet, is that right? Approximately 60 feet. There was no official measurement taken, but they, you know, they looked at the video and estimated it to be about 60 feet. He covered approximately 40 to 50 percent of the distance between them in that time. If he were standing still and saying, all right, I'm complying, you would agree that the officers would not be entitled to qualified immunity? Correct. I would agree to that. And if we want to skip to qualified immunity, because I think that there's been a good amount of discussion so far about what level of generality we should look at when considering qualified immunity, but I think that discussion is a little bit moot. Because even at a very high level of generality, they have not been able to provide any cases that are similar to this one. And now what level of generality am I talking about? I'm talking about any case that has the three following facts. One, the suspect must possess a gun or at least something with a similar capability to harm. Two, the suspect must refuse repeated orders from the officers to disarm. And three, the suspect must make some other affirmative act to present a threat to the officers. He's not just standing there with the gun. He's doing something else. And they have failed to provide any cases that have these three facts. If you consider George, what the court said in that case was, there's a set of facts that a jury could find under which he was just standing there with his walker, with a gun, and made no offensive motion. And under those facts, there would have been a violation. Same thing with the minor in Lopez. He was just turning around with the gun. They said, well, you know, under the gun, it was a toy gun in that case, but he was just turning around. They said, well, a jury could determine that he was just turning around and making no offensive motion. And under those facts, there would have been a violation. So they haven't provided any case with those three elements, and therefore, they haven't provided anything that would put the officers on notice. Quite to the contrary, we provided the Blanford case, in which all three of those elements were present. But even in that case, the third element, which is the level of threat presented by the suspect, was much lesser than the case here because the threat was only theoretical. He was not putting anyone imminently in danger. He was just trying to walk inside a house. The officers didn't know if anyone was in that house. They didn't know if the suspect was trying to harm anyone in there. They just assumed that that could have been the case, and they acted. And this Court found that their actions were constitutional, not even protected by qualified immunity, fully constitutional, because he did something that could have put other people in danger. But the only way that we can rule in your favor on the Arizona State law claim is to essentially decide the first prong of qualified immunity. I mean, either in the Fourth Amendment context or the same test as to Arizona State law. In order to decide the Arizona State law issue, we must reach what is, in essence, the first prong of qualified immunity. I think that even the second prong of qualified immunity should be effective in disposing of the State law claim. Well, how can that be? How can putting an officer on notice answer the question of whether the force used was objectively reasonable and the like, most favorable to the plaintiff? Well, it doesn't answer the question of whether the force was reasonable. It just answers the question of whether the claim is available to be made, because under qualified immunity, well, I mean, it's immunity, Your Honor. It's the exact same action that they had taken in both circumstances. The claims are made under the exact same standards. And if they're immune from suit, then they're immune from suit. And so I believe that— But the clearly established law came into play in Arizona negligence. Sorry. Could you repeat that, Your Honor? Yes. I mean, you're talking about qualified immunity where the law is clearly established. I don't think that's part of Arizona negligence law. Do you? No. It's not part of Arizona negligence law. So why do you say that it is? Well, I'm not saying it's part of Arizona law here. I'm just saying when the Court's considering the case here, I think that if officers, if any government entity has taken certain actions and that action is immune, then it's immune. But can't we still decide that — couldn't we still decide that while there's no — where there may be no clearly established law, that the officers' actions weren't reasonable? You could decide that the officers' actions weren't reasonable. I mean, I would personally disagree for all the reasons we've talked about, because I think that he was presenting a significant threat of physical harm and that their actions in response to that were reasonable. But even if you thought that their actions were unreasonable, I think that qualified immunity would still apply, because they're — But it couldn't apply to the Arizona claim. So explain to me how — and this is a version of Judge Sidney Thomas' question — how could this second prong bar the Arizona claim if, as Judge Holly Thomas said, we were to find that a jury could find that the actions weren't objectively reasonable? Don't we have to find they, in the light most favorable to the other side, they were objectively reasonable in order for you to win on Arizona claims? Well, Your Honor, I — I mean, maybe I'm missing something here, but I'm not understanding your argument. I don't have any case authority to support this. This is just my own reckoning of how this should work. But if government entities take a certain action and the they are immune from suit, and I think that that's true regardless of if they bring it under Federal law — But this isn't absolute immunity. It's qualified immunity under Section 1983. Correct. So as far as I can tell, Arizona has not adopted a qualified — a similar qualified immunity analysis in considering negligence cases. You're correct, Your Honor. I mean — I think where you're getting at is perhaps the standard of care, but the standard of care to win in a negligence case is different from 1983. Certainly. I mean, as both parties have recognized, the analysis under the wrongful death statute is basically the same as the Fourth Amendment statute here. But as I understand it, a peculiarity that I think the parties agree on — but correct me if I'm wrong and I'll ask your friend this — is that under the Arizona wrongful death statute, there has to be an underlying intentional tort. In this case, the allegation is battery. And that negligence does not suffice for some reason under Arizona law to, in these circumstances, make out a wrongful death claim. Is that right? I would need to go back and look — I would need to go back and look at the specific language of the wrongful death statute, Your Honor. I think that — I mean, in Arizona, wrongful death claims are brought for negligence cases rather than just intentional torts. But I think that in either case that they are immune. I mean, I don't — I would need to go — I can't give you a solid answer right now because I don't have the statute right in front of me, so I apologize for that. Well, it differs from state to state, but some states have held that — have declined specifically to adopt a state-analogous qualified immunity defense. And I'm not entirely sure where Arizona is on this, but the theories are different. Yeah. So, to my knowledge, Arizona has not adopted the Section 1983 qualified immunity standard. The way I'm reading the district court's order, which, as far as I can tell, is correct, at page 23 of the order, plaintiffs cannot base a negligence claim on an intentional use of force nor on a law enforcement officer's negligent evaluation of whether to intentionally use force, that rather any negligence claim must be based on a conduct independent and that — of the use of force, and that to base it on the intentional use of force, there has to be an intentional tort, which here is alleged to be battery. Right. I agree with the district court, Your Honor. I agree with the district court. I'll put it — I'll leave it there because Judge Logan had been looking at the statute much  Well, right, but, I mean, the question, then, under state law is whether there's a genuine issue of material fact, a genuine factual dispute. Correct. And there would appear to be that in this case. I think that there's no question of material fact, Your Honor, because I think that the uncontested facts and the facts shown by the video, because when there's a video, we interpret the facts in the light displayed by the video. I think that we can interpret all of the facts that are uncontested to show that Mr. Rudman was presenting a significant threat of physical harm and that, as a result of that, the officers were in — or the deputies, excuse me, were entirely justified in using lethal force in response to that. And I can talk about that a little bit more if you desire, but — because as I was mentioning sort of at the top, as Mr. Rudman is approaching them, as he's approaching the deputies, he's noticeably increasing the threat that he presents to their physical well-being while he's also — Correct. I mean, you have your theory, and he has his theory, which is he's doing nothing. He's just got his arm at his side, and there were alternative methods available that were less destructive. So alternative methods — Which is not part of the, necessarily, the 1983 analysis — Right. — but probably part of the state law analysis. I disagree with that — Reasonableness is different from what's required under 1983. Well, the way the tests have been — at a baseline level, both the Fourth Amendment under Section 1983 and the Arizona state law wrongful death claim ask if the officer's the defendant's conduct was objectively reasonable. If they took actions that were reasonable under the circumstances, then there is no liability. And I think that that's the same in either case. I think the analysis translates perfectly in either case, and so I don't see how there would be — And what case says that? Excuse me? What case says that? For the state law? I would be — I believe we cited something in our papers. I think both sides did. But I would need to go back and look, Your Honor. I don't have that off the top of my head. And if you want me to submit additional authority, I can, but that's up to you. So, counsel, if hypothetically the court were to affirm on the federal law claims but reverse on the state law claim, would the state's position — or, I'm sorry, the defendant's position — be that the state law claim should remain in federal court? I haven't really thought about that one, Your Honor. I — Well, it would be up to the district court to decide whether or not to exercise supplemental jurisdiction. Right. It would be up to the district. I mean, all federal questions would be removed, so I imagine it would go back to state court, but I don't have, you know, strategically what would we prefer to do or what would we want to do. But if we were to hypothetically do that, you would certainly want us to leave that option open to the district court? I would think so, but I don't — yes, I would like to leave that option open. But again, I think that looking at the facts, there is no reason to remand on the state court — or on the state law issue because, again, their conduct was objectively reasonable in the face of a significant threat of physical harm. And I know that you guys are all aware of the facts, so I won't rehash them over and over. But one thing I do want to point out that has not been discussed so far is that a further display of the reasonableness of the deputies' conduct in this case was their simultaneity of action and the fact that they independently — all of them, or at least four of the five — all arrived at the same time at the notion that they needed to do something to defend themselves. All — like, Mr. Rudman was coming at them, as I mentioned, all the time the threat was increasing. And he reached a certain point. And once he reached that point, they all came to the conclusion, all right, I need to take action right now. And the fact that they all — or three of them, three of the five — shot at the exact same time, independently coming to the conclusion that lethal force was necessary under that situation, I think that that's a strong indicator that the force here was reasonable. This was not the case of a twitchy trigger finger or some guy — or one officer jumping gun. Do you have a final point you want to make, counsel? No, I have no final wrap-up point I want to make other than to say that unless you have any other questions about, like, the 14th Amendment claim or the use of the less-lethal shotgun, I'm happy to answer those. But I have no final point. All right. Thank you. Thank you. And we'll give you, as I said, two minutes for rebuttal. Thank you, Your Honors. Given this Court's familiarity with federal law, I think I might be of best assistance if I focus on some of the state law questions. And here's — here are some facts that I think answer some of the Court's concerns first. Judge Thomas, as much as I would like the standard to be negligent, Judge Bennett is correct under a case — Well, you — there has to be an underlying — I get that, that there has to be an underlying battery or something like that. And that's Ryan Brisson. But then, if you have that, then you get to get through to the negligent standard. Correct. You look to whether there was reasonable action under Arizona's justification statutes. To answer, I think it was Judge Holly Thomas's question. There is no case in Arizona that says — that graphs the federal qualified immunity clearly established case law onto a use-of-force case in Arizona. That just doesn't exist. And for, I think, good reason, as much as I don't want to create additional hurdles for myself on the constitutional question of clearly established law, the courts recognize that because it's a — because this is not just pure tort liability, because the constitutional violation requires a lot more, that's why the qualified immunity analysis is appropriate in the constitutional context, but much less so it wouldn't be appropriate in the state law context because, A, well, there's just simply no heightened burden, and, B, there's simply no case law which graphs the federal qualified immunity clearly established law onto Arizona's wrongful death negligence battery statute. So if this court were to find, and we believe it appropriately should, that where Judge Logan may have gone a bit too far was to say, as a matter of law, that no jury could find unreasonable action, in that instance, then, we believe that the wrongful death case should survive, and because this is a case that was removed, was filed in state court, removed by the defendants to the district court, there would no longer be a basis for federal jurisdiction issue. Well, the district court could exercise supplemental jurisdiction, but I expect one of you moved to remand, and you'd have to deal with that. That's correct. In fact, we would argue that for efficiency purposes, there's no being no federal claim that it should go, it's appropriately before the state court. Thank you very much for your time, Your Honor. All right. Thank you. We thank both counsel for their arguments, and the case just argued will be submitted, and with that, we are adjourned for the day. Thank you.
judges: THOMAS, BENNETT, THOMAS